**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**SANDRA OLTMANN,**
**Natural Parent on behalf of**
**R.O.,[1] a minor**

        **Plaintiff,**

                            **Civil Action 2:17-cv-514**
      **v.**                     **CHIEF JUDGE EDMUND A. SARGUS, JR.**
                            **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Sandra Oltmann ("Plaintiff"), on behalf of her minor child ("R.O."), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for child's Social Security Supplemental Security Income benefits ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (ECF No. 22), and the administrative record (ECF No. 7). For the reasons that follow, it is **RECOMMENDED**

---

[1] Pursuant to Fed. R. Civ. P. 5.2(a)(3), the name of an individual known to be a minor in a filing with the court may only include the minor's initials; *see also* ECF No. 25 (citing Rule 5.2(a)(3) and ordering Plaintiff to file a revised Complaint that reflects that the child's mother and wage-earner as Plaintiff).

that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and

**REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff filed an application for benefits on behalf of her minor child, R.O., in April 2013, alleging that R.O. has been disabled since January 1, 2012, due to hypertonia, global delays and ataxia foot deformities. (R. at 151–56, 465.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 103–05.) Administrative Law Judge Thomas L. Wang ("ALJ") held a hearing on November 13, 2015, at which Plaintiff and R.O., who was represented by counsel, appeared and testified. (R. at 42–73.) On March 4, 2016, the ALJ issued a decision finding that R.O. was not disabled within the meaning of the Social Security Act. (R. at 18–36.) On April 17, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–7.) Plaintiff then timely commenced the instant action.

## II. PLAINTIFF'S HEARING TESTIMONY

At the administrative hearing, R.O.'s mother testified that R.O. is not always able to understand or comply. He suffers mental setbacks when things change or his daily routine is disrupted. (R. at 48.) She stated that R.O. is not able to keep up during the day and sometimes is unable to complete physical therapy due to pain. (*Id.*)

When asked how R.O. is different from other children, Plaintiff testified that she felt R.O.'s maturity level is that of a five-year old even though he is eight. (R. at 49.) She stated that his mobility is at least two and half years behind. Plaintiff testified that R.O. does not accept spontaneous play with other children and his communication is very slow. She testified

that R.O. exhibits infant-type behaviors such as eating non-food items. She stated that when he greets another child, he will rub his/her hair. (R. at 50.)

Plaintiff also testified that R.O. has difficulty with getting up in the morning and getting ready for school. Plaintiff testified that R.O. "sleeps a lot," but he still seems fatigued in the morning. R.O. is stiff when he gets out of bed and bathing, showering and general hygiene present significant problems for R.O. (R. at 52.) She also testified that eating is difficult for R.O. because his mouth gets fatigued so he prefers to eat soft food or items he can pick up with his hands. (R. at 53.) He will become distracted if other people are around and will not eat. He often has difficulty in the school cafeteria because it is loud or there are too many people around. (R. at 54.)

According to Plaintiff, R.O. has difficulty identifying emotions of others and has difficulty processing communication. R.O.'s speech is slow when conversing and if he is distracted he will not communicate. (R. at 56–57.) She testified that R.O. can become physical in a situation that is unexpected or not explained ahead of time. Plaintiff continued that she "walk[s] on eggshells" because she does not want something "to set R.O. off," leading to a bad day. (R. at 58.) She testified that R.O. does not have a best friend or a group of friends. He has difficulty processing rules and directions in certain situations. (R. at 60.)

Plaintiff further testified that R.O. has difficulty paying attention in school and staying on task. He will get up from his desk and walk around, he fidgets and eats erasers. It takes R.O. much longer to complete assignments and he has trouble completing homework because he does not remember instructions. (R. at 62.)

When asked whether she has noticed R.O. making any progress in light of the various treatments and therapies he has tried, Plaintiff stated that he makes a little progress with respect

to physical or occupational therapy but quickly loses the skill. She said that she has not seen significant progress in other areas of deficit. (R. at 68.)

R.O. also testified during the hearing, answering the ALJ's questions regarding hobbies, family, friends, and school. (R. at 69–71.)

### III. MEDICAL RECORDS

#### A. Nationwide Children's Hospital

R.O. underwent a psychological evaluation by Michelle Sprader, Psy.D. in December 2011, when he was 4 years old due to concerns about autism. (R. at 581–92.) Adaptive Behavior Assessment (ABAS-II Composite-60) testing showed that R.O. had low average to below average cognitive scores, generally average pre-academic skills, and mildly delayed adaptive skills. (R. at 583.) R.O.'s nonverbal and verbal cognitive skills were in the low average to below average range. (*Id*.) Nonverbal skills of matching and pattern completion were strengths. (*Id*.) R.O.'s score on the Autism Diagnostic Observation Schedule ("ADOS") was at the autism cut-off, and his mother's Autism Spectrum Rating Scale ("ASRS") ratings were all significant for autism and consistent with the ADOS. (R. at 583, 591–92.) Teacher ratings were not significant for autism. (*Id*.) Dr. Sprader noted that R.O.'s language and socialization skills for daily purposes are lower than would be expected given his cognitive and language testing scores. (R. at 583.) Language problems include that he does not initiate conversations or make requests, he had stereotyped language in the past, and his pretend play is primarily imitative of his brother. (*Id.*) Social problems include decreased use of eye contact and gestures, poor direction of facial expressions toward others, and reciprocity that is only toward primary family members. (*Id.*) R.O. has difficulty with change and engages in spinning of objects. (*Id.*) At the time of this evaluation, Dr. Sprader concluded that R.O. met

4

the criteria for pervasive disability disorder, not otherwise specified, which would likely be referred to as Autism Spectrum Disorder.   (*Id.*)

When seen in the physical medicine clinic for a leg brace check, Plaintiff reported that R.O. was having increased behavioral issues at home and at school.   (R. at 1105.)

R.O. underwent another psychological evaluation in November 2013, when he was 6 years, 5 months old, with Micheline Silva, Ph.D. as a follow-up in order to determine his levels of functioning to aid in his psycho-educational planning.   (R. at 1129–47.)   Plaintiff reported that since school had started R.O.'s behaviors had improved, but he still tended to isolate himself and get upset when abruptly approached by other children or pets.   (R. at 1129.)   She further noted that in the past six to nine months, R.O. had become more aggressive towards his brothers and had kicked his teacher and hit a classmate.   (R. at 1131.)   Dr. Silva noted that there were no difficulties with motor or with verbal communication.   Eye contact was appropriate, but facial expression had limited range.   Activity level was well-modulated with good impulse control. (R. at 1133.)   R.O. was periodically distracted but able to refocus on tasks with minimal intervention. There were some symptoms of anxiety briefly observed during the initial portion of the testing. Verbal communication and social behavior were appropriate.   Dr. Silva reported that R.O. grasped directions quickly with no elaboration needed.   Perseverance was appropriate as was response time.   He did tend to perseverate and use the same approach several times before switching.   (*Id.*)   Stanford-Binet intelligence testing resulted in a nonverbal IQ of 83, a verbal IQ of 85, with a full scale IQ of 83.   (R. at 1134.)   On the Leiter performance test, R.O.'s overall nonverbal cognitive abilities are in the borderline impaired range in comparison to his age group. His nonverbal fluid reasoning score was in the low average range, significantly higher than his score on the nonverbal fluid reasoning on the Stanford-Binet.   This suggests that R.O.'s

performance significantly improves in tasks measuring nonverbal fluid reasoning (from below average to low average) when instructions are provided nonverbally through the use of gestures and mimics.   (R. at 1135.)   Achievement testing for word reading, spelling, and math computation were all in the borderline range.   Plaintiff completed the Vineland Adaptive Behavior Scales, which placed R.O. in the moderately low to low ranges in all areas.   (R. at 1137.)   On the Child Behavior Checklist and Teacher Report Form as well as the Conner's test, Plaintiff perceived "clinically significant symptoms" of anxiety, while R.O.'s teacher did not perceive any "clinically significant symptoms" of any of the disorders measured, *i.e.*, anxiety, depression, social problems, thought problems, attention problems, aggressive behavior, depression, attention deficit/hyperactivity disorder, oppositional defiant disorder, and conduct problems.   (R. at 1137–38.)   Dr. Silva assessed R.O. with Pervasive Development Disorder not otherwise specified (PDD-NOS), Autism Spectrum Disorder, Language Disorder, Developmental Coordination Disorder, and Borderline Intellectual Functioning.   (R. at 1140–41.)

R.O. attended occupational therapy between May 2014 and March 2015.   (R. at 1882-2222.)   His goals were to increase his overall developmental skills and improve his ability to grade muscle force and use appropriate muscle groups during fine motor activities.   (R. at 1903.)   When assessed in March 2015, R.O. was found to be happy/cooperative at beginning of session.   He became frustrated during last 15 minutes with handwriting activity and demonstrated poor tolerance of therapist redirection and therapeutic recommendations.   His assessment of progress was found to be less than expected. Overall, R.O. made inconsistent progress towards established goals.   (R. at 2222.)

R.O. underwent a two- day psychological assessment with Christine M. Eichelberger, Ph.D., in March 2015 when he was 8 years old. (R. at 2319–24.) Stanford – Binet Intelligence testing resulted in the full scale I.Q. test of 88. (R. at 2320.) Dr. Eichelberger noted that R.O.'s cognitive functioning scores were lower than his previous evaluation indicating failure to progress at the expected rate. (*Id.*) His language functioning scores indicated global receptive delays and expressive language deficits and significant delays in use of social language. With respect to adaptive behavior the teacher rating endorsed inattention, hyperactivity/impulsivity, defiance/aggression and peer relation scales in the very elevated range indicating many more concerns than typically reported for children of R.O.'s age. (R. at 2322.) Dr. Eichelberger concluded that R.O. continued to meet the criteria for diagnosis of Autism Spectrum Disorder with accompanying language impairment and cognitive impairment along with developmental coordination disorder, mixed receptive expressive language disorder and mild intellectual impairment. (R. at 2323.)[2] Dr. Eichelberger did recommend that R.O. continue to attend a general education classroom with paraprofessional support, and that he be re-evaluated in two to three years. (R. at 2323–24.)

### B.    Consultative examination: Jack J. Kramer, Ph.D.

On June 26, 2013, Jack J. Kramer, Ph.D. evaluated R.O. for disability purposes. (R. at 1095–1102.) At the time of this evaluation, R.O. was 6 years 3 months old. (R. at 1095.) R.O.'s mother indicated that he has no eating problems, and that he eats a wide variety of foods. (R. at 1096.) Dr. Kramer performed psychometric testing which resulted in a Full Scale IQ score of 79. (R. at 1097.) Dr. Kramer noted that R.O. "required a little redirection during

_____

[2] Page 10, which contains the majority of Dr. Eichelberger's recommendations, is missing from this report. (*See* R. at 2323–24.)

testing to stay focused." (R. at 1095.) R.O's mother she lays his clothes out the night before and needs assistance getting dressed. (R. at 1098.) He can bathe himself, but needs assistance setting the water temperature and getting himself completely clean. (*Id*.) He sleeps well. Dr. Kramer observed that R.O. was pleasant but immature during the examination. (R. at 1095.) He was not excessively active but struggled with remaining focused and paying attention nevertheless was responsive to redirection. (*Id*.) Eye contact was adequate with no evidence of depression or anxiety. He found R.O.'s test scores to be in the "borderline to low average range, with language skills a relative strength." (R. at 1098.) Dr. Kramer further noted that, R.O.'s "[p]revious test scores reported in his records indicated cognitive and language scores in a borderline to low average range. He appears to be learning early skills, although skills are a little harder for him. During the current examination, he understood instructions and was responsive to questions." (*Id.*) Dr. Kramer, also noted that R.O. struggles "a little" with focus and attention, but was responsive to redirection, and he rated R.O.'s concentration, persistence, and pace as adequate, and found that he "completed testing without too much difficulty." (*Id.*) Dr. Kramer diagnosed a pervasive developmental disorder, not otherwise specified and assigned R.O. a GAF score of 58. (R. at 1099.)

### C. State agency review

State agency reviewing psychologist, Mel Zwissler, Ph.D. and state agency pediatrician, Uma Gupta, M.D. opined on July 11, 2013, that R.O. did not meet, medically equal, or functionally equal any listing. (R. at 80–82.) They opined that R.O. had less than marked impairments in all six regulatory functional domains, but noted that R.O. "[s]truggled to remain focused and attentive." (R. at 81–82.) They gave "great weight to Dr. Kramer's assessment noting his opinion is consistent with other evidence. Even though R.O. does have some

problems related to attention and task persistence, he was pleasant and responsive to Dr. Kramer."   (R. at 83.)

In January 2014, state-agency psychologist, Courtney Zeune, Psy.D.; state agency pediatrician, John L. Mormol, M.D.; and state agency speech-language pathologist, Melissa Hall, M.A. reviewed the mental health evidence upon reconsideration and affirmed the initial assessment.   (R. at 87–97.)

## IV.   EDUCATIONAL RECORDS

In February 2013, Columbus City Schools completed an Individualized Education Program ("IEP") for the conclusion of R.O. preschool services when R.O. was five years old. (R. at 490–518.)   It was noted that R.O. met eligibility requirements for both Significant Developmental Delay and Speech Impairment under Individuals with Disabilities Education Act guidelines and initially received early intervention services and initial preschool services when in the Gwinnett County Public School system in Suwanee, Georgia in June 2010.   R.O. transferred to Columbus City Schools in March 2011 where he attended Franklin County and received itinerant speech and language services.   R.O. received physical therapy services in a special needs preschool setting to further develop his gross motor skills and support his classroom learning.   (R. at 500.)   R.O.'s articulation abilities are within normal limits when compared to other peers his age.    Language objectives on this IEP were geared toward social/pragmatic language.   Prognosis for improvement was good based on early intervention and strong parental support.   (*Id.*)   The IEP documented that R.O. needed frequent reminders to demonstrate appropriate behaviors in a group (i.e., active listening, appropriate eye contact, and taking turns). The IEP also documented continued difficulty following multi-step directions and participating in conversational activities.   (R. at 494.)   R.O. was able to follow along with book reading, and

9

was able to follow one and two-step instructions.   (R. at 492.)   He was able to be redirected back to task.   (*Id.*)

In assessing R.O.'s special education services transition from preschool to kindergarten in May 2013, an evaluation team, consisting of teachers, counselors, school psychologist, therapist, etc. completed an Evaluation Team Report ("ETR").   (R. at 545–77.)   R.O. began receiving services through the Columbus Public School District in March 2011 through Franklin County. R.O. received physical therapy services focusing on development of overall gross motor skills while he has attended special needs preschool.   (*Id.*)

Stefanie River, the school psychologists administered WISC-IV (Wechsler Intelligence Scale for Children), which resulted in verbal comprehension score of 99; perceptual reasoning of 92; working memory of 74; and processing speed of 83—all scores within the average to borderline range, with a full scale IQ score of 86.   (R. at 560–61.)   Dr. River found this score falls within the below average range and at the 18th percentile.   (R. at 566.)   His GAI (general ability index) standard score was 96, which falls within the average range.   (R. at 561.)   On the Bracken Basic Concept Scale, measuring academic readiness, R.O. achieved an average score. (*Id.*)

The ETR team concluded that R.O. was functioning within the below average and average ranges on the measures of intellectual ability and pre-academic achievement.   No difference was noted between his verbal skills and his non-verbal or performance skills which may indicate that his overall skills were developing at a commensurate rate.   A cognitive score of this level indicated the ability to learn in a general education environment, however, R.O., primarily due to his diagnosis of Autism, required additional repetition of concepts and frequent review and practice of information to insure comprehension.   It was noted that R.O. displays

difficulty with demonstrating and displaying appropriate social interaction and interpersonal skills with others. He also displayed difficulty with focusing his attention and attending to the presented tasks, activities and lessons. R.O.'s social emotional delays may adversely affect his ability to establish and maintain interpersonal relationships with his peers and adults and with demonstrating socially acceptable behaviors in a variety of settings and situations without adult assistance, intervention or reminders. Based on the complete assessment results and R.O.'s medical diagnosis of an Autism Spectrum Disorder (ASD), it was determined that R.O. would benefit from receiving special education services, assistance, intervention and therapy through the Autism program. (R. at 566.)

Along with the ETR, in May 2013, R.O.'s IEP for the 2013–2014 school year was completed for his transition to school-age services. (R. at 521–38.) R.O.'s disability category was listed as Autism. It was noted R.O. attended a special needs preschool classroom and received speech and language and physical therapy. He has demonstrated growth in his skills. However, current levels of performance in these areas may remain significantly delayed as compared to peers of the same age. Based on his re-evaluation, R.O. has identified academic deficits that would most likely adversely affect his performance in the general education setting. He requires specialized instruction in a small group setting in which his progress can be closely monitored. (R. at 523.)

In May 2014, the IEP was completed for R.O.'s 2014-2015 school year. (R. at 162–72.) It was noted that testing his math abilities, R.O.'s scores were in the thirty-seventh, ninety-seventh, and ninetieth percentiles, in fall 2013, winter 2014, and spring 2014 respectively. (R. at 162.) These scores placed him in the high and high average ranges with regard to measurement and data; number, operations, and geometry; operations and algebraic thinking;

and oral counting and math computation.  (*Id.*)   In reading, he was found to have a low-range of vocabulary use and functions as compared to other students.  (R. at 164.)   With respect to his social skills, he is usually cheerful but his mood can change quickly and back again.   His teacher noted that R.O. is capable of playing "rule-governed" table games and active games with adult direction.   He takes turns and shares with adult help/reminders.   R.O. can usually play cooperatively with 1-2 friends for 5-10 minutes with adult supervision.   His Kindergarten teacher has expressed a concern for R.O. to become more aware of the feelings of his peers, (*i.e.*, when he accidentally bumps into someone and they fall down to be able to show concern for that person and/or to say he is sorry).   (R. at 166.)

The record contains several incident reports from Noble Academy between late 2014 and early 2015.   (R. at 195–207, 312–21.)   These reports document various behavioral issues R.O. exhibited such as running out of the classroom when asked to read; kicking a door and throwing a

chair; putting hands on, kicking, shoving and pushing other students; swinging arm at and pushing

a teacher; using inappropriate language; ripping items and refusing to follow directions throughout

the day.   In January 2015, R.O. received a suspension from school for his behavior.   (*Id.*)

R.O.'s IEP for the 2015-2016 school year, when he was 8 years old, demonstrated a significant amount of difficulty in his ability to self-regulate emotions and behaviors with emotional set-backs occurring in and outside of the classroom.   (R. at 297.)   Despite the assistance of an aide, R.O. still displayed negative behavior.   With respect to reading and written expression, most of the time, R.O. was unable to complete an activity or assignment in class or

small group due to an emotional set-back or oppositional defiance.   Over the course of the year, R.O. had received eight write-ups due to behaviors towards teachers and peers.   (R. at 293.) When discussing his reading and written, it was noted R.O. participated in testing which showed "in the fall 2014 (185-above average) in the winter 2015 (175), and the spring 2015 (178).   The scores were inconsistent because R.O. had a difficult time completing the assessment.   He would often click random answers without reading the text, and shut down frequently.   R.O. has shown progress in his reading skills.   He does a really great job utilizing decoding strategies to help him sound out words that are unfamiliar to him, to better support his reading.   R.O. has also demonstrated improvement in his comprehension abilities.   When focused, he is able to accurately respond to a grade-level text.   The majority of the time that R.O. is unable to complete an activity or assignment in the classroom or a small-group setting is due to an emotional setback, or oppositional defiance.   We know he is very capable to completing the work.   R.O. is reading at a level D text (grade level equivalent)."   (R. at 301.)

Plaintiff's counsel submitted documents to the Appeals Council (attached to the Statement of Errors (ECF No. 11)), which include an IEP report effective for the 2016-2017 school year; and the (ETR) completed on May 17, 2016.

## V.       THREE-STEP INQUIRY

The Commissioner uses a three-step process to determine if a child applicant is disabled and entitled to benefits: (1) if the child is engaged in substantial gainful activity, the child is not disabled; (2) if the child does not have a severe medically determinable impairment or combination of impairments, the child is not disabled; and (3) if the child's impairment(s) do not meet, medically equal, or functionally equal the listings, the child is not disabled.   20 C.F.R. § 416.924.

At the third step, an impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The regulations identify six domains of functioning to be considered: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A claimant has a "marked" limitation if the claimant's impairments seriously interfere with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(e)(2)(i). A "marked" limitation is more severe than "moderate" and less severe than "extreme." 20 C.F.R. § 416.926(e)(2)(i). An impairment causes an "extreme" limitation when it interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(e)(3)(i). In determining the effect of an impairment on the six domains, the Commissioner considers information from medical sources, parents and teachers, and consultative examiners. 20 C.F.R. § 416.926a(b)(3).

## VI. ADMINISTRATIVE DECISION

On March 4, 2016, ALJ Wang issued his decision. (R. at 18–36.) The ALJ found that R.O. suffered from the following severe impairments within the meaning of 20 C.F.R. § 416.924(c): pervasive developmental disorder, autism spectrum disorder, developmental coordination disorder, language disorder, global developmental delay, borderline intellectual functioning, and spastic diplegia. (R. at 21.) The ALJ concluded, however, that R.O. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 25.) In the six domains used to determine a child's functional equivalence, the ALJ found that R.O. has "less

than marked" limitation in the domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects, caring for oneself, and health and physical well-being (R. at 28–36); "marked" limitation in the domain of interacting and relating with others (R. at 31–32); and no "extreme" limitations in any area of functioning. The ALJ consequently concluded that R.O. was not disabled within the meaning of the Social Security Act. (R. at 36.)

## VII.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII. ANALYSIS

In her Statement of Errors, Plaintiff contends that the ALJ erred by finding R.O.'s limitation to be "less than marked" impairments in the functional domains of attending and completing tasks, caring for oneself, and acquiring and using information. (ECF No. 11 at 10–13.) Plaintiff also argues that the Appeals Council erred in declining to consider evidence submitted after the ALJ's decision and that the Court should order a Sentence Six remand for new and material evidence. (*Id*. at 13.) The Court addresses these arguments in turn.

## A. Attending and Completing Tasks

The domain of attending and completing tasks generally considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h); *see also* S.S.R. 09-4p. For school-age children (age six to attainment age of twelve), the following is specifically considered:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments).

16

You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv). Some examples of limitations in this domain may include being slow to focus on, or fail to complete activities of interest; repeatedly becoming sidetracked from activities or frequently interrupting others; becoming easily frustrated and giving up on tasks, including ones capable of being completed; requiring extra supervision to keep engage in an activity. 20 C.F.R. § 416.926a(h)(3)(ii)–(v).

In the present case, the ALJ determined that R.O. had a "less than marked" limitation in this domain, reasoning as follows:

On the claimant's IEP [Individual Education Plan] it was noted that [R.O.] displayed difficulty with focusing his attention and attending to the presenting tasks, activities, and lessons (Exhibit 6D, p. 2). His behaviors that included shut-down/avoidance was interfering with completing classroom work (Exhibit 7D, p. 7). And at the consultative examination Dr. Kramer stated that the claimant struggles "a little" to stay attentive and complete tasks but was responsive to prompts and "completed testing without too much difficulty" (Exhibit 7F). However, during occupational therapy sessions the claimant would be able to concentrate and perform tasks for approximately 15 minutes but then have behavioral problems that would end the sessions (Exhibit 20F). Yet during his IEP the occupational therapist noted that [R.O.] was pleasant to work with and cooperative and required rest breaks or self-regulating activities to remain on task (Exhibit 6D). The claimant had little difficulty responding to questions asked of him at the hearing. Although [R.O.] has problems with his behavior, he is able to remain on task for completion of extensive psychological and achievement testing. Therefore, I find that this domain is also "less than marked[.]"

(R. at 31.)

Plaintiff argues that the ALJ's decision in this regard is not supported by substantial evidence. (ECF No. 11 at 11–12; ECF No. 22 at 2–3.) The Undersigned agrees. The ALJ acknowledges that R.O. has difficulty staying attentive and completing tasks, but apparently

17

dismisses those findings because an occupational therapist noted in May 2013, that R.O. was "pleasant to work with and cooperative"; that R.O. was "able to remain on task for completion of extensive psychological and achievement testing[,]"; and that R.O. "had little difficulty responding to questions asked of him at the [administrative] hearing [before the ALJ]." (R. at 31.) However, the fact that R.O may have been pleasant and cooperative at times with an occupational therapist in 2013 does not undermine extensive evidence in the record that R.O. had problems focusing and completing tasks, including an IEP dated April 27, 2015, which the ALJ did not specifically address when analyzing this domain. (R. at 31, 291–321 (IEP dated April 27, 2015 ("2015 IEP")).) For example, the 2015 IEP noted that R.O. had frequent shut downs, was unable to complete a classroom activity or assignment "[t]he majority of the time," experienced difficulty completing assessments and required frequent breaks during such assessments, and required significant teacher support to complete classroom activities. (R. at 293–94, 297, 301.) The ALJ's decision therefore "does not reflect that the ALJ considered the effect of the significant structure and supportive services provided to plaintiff on her ability to independently initiate, sustain, or complete activities in assessing the domain of attending and completing tasks." *Tribble v. Comm'r of Soc. Sec.*, No. 1:14-cv-704, 2015 WL 7179662, at *6–7 (S.D. Ohio Nov. 16, 2015) (citing 20 C.F.R. §§ 416.926a(a)(l),416.926a(e)(2)(i), 416.926a(e)(3)(i), and noting further that the Social Security regulations require the ALJ to examine how much extra help a child needs and the effects of structured or supportive settings"); *cf. Tyson v. Comm'r of Soc. Sec.*, No. 1:16-cv-130, 2017 WL 1130028, at *5 (W.D. Mich. Mar. 27, 2017) (reversing and remanding decision denying benefits where, *inter alia*, the administrative law judge did not identify or explain certain evidence); *Newberry v. Colvin*, No. 3:14-cv-80, 2015 WL 4365954, at *5 (S.D. Ohio July 16, 2015) ("[A] claimant's ability to be

'pleasant' during a psychological examination is not evidence adverse to a marked mental work limitation."), *adopted by* 2015 WL 4639754 (S.D. Ohio Aug. 4, 2015).

Similarly, the ALJ's finding that R.O. "is able to remain on task for completion of extensive psychological and achievement testing" does not amount to substantial evidence supporting a finding of a less than marked limitation in this domain. The ALJ fails to acknowledge that the 2015 IEP, in addressing R.O.'s psychological and achievement testing specifically noted that R.O.'s "*scores on all tests should be interpreted with caution* given his diagnosis of spastic diplegia as well as frequent behavioral shut down and refusal to complete items that occurred during the portion of the evaluation." (R. at 294.) R.O. also "often shuts down during any type of assessment" and "[f]requent breaks are necessary in order for him to complete any type of assessment." (*Id.* (emphasis added).) Dr. Kramer, too, noted in 2013 that R.O. "required a little redirection during testing to stay focused." (R. at 1095.) The ALJ's reliance on R.O.'s supposed ability to focus when completing testing is therefore not supported by the record. *Id.*; *see also Tribble* 2015 WL 7179662, at *9 (finding that the ALJ's reasoning that the plaintiff had a less than marked limitation in attending and completing tasks "ignores the balance of the record evidence").

Finally, the ALJ supported his finding of a less than marked limitation by noting that R.O. "had little difficulty responding to questions asked of him at the [administrative] hearing [before the ALJ]." (R. at 31.) While an administrative law judge may rely on personal observations when assessing credibility, "the ALJ's reliance on his personal observation in this case was more akin to those of a medical or psychological expert assessing symptoms of a patient or examinee, and then drawing conclusions therefrom." *Trudell ex rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 898 (E.D. Mich. 2001). The observations in this regard of the ALJ, a lay

person, therefore do not constitute evidence supporting a less than marked limitation in the domain of attending and completing tasks. *Id.*; *see also Newberry v. Comm'r of Soc. Sec.,* No. 3:16-cv-236, 2017 WL 4070607, at *5 (S.D. Ohio Sept. 12, 2017) (finding that ALJ's reliance upon the plaintiff's appearance at a consultative examination and at the administrative hearing was improper); *Vondenberger v. Colvin*, No. 3:14-cv-202, 2015 WL 3867447, at *6 (S.D. Ohio June 23, 2015) ("The ALJ's lay observations of Plaintiff during a 1-hour administrative hearing have no probative value regarding Plaintiff's ability to function on a sustained basis nor should they be used to supplant the years of clinical examination findings and interpretation by Dr. Lease."), *adopted by* 2015 WL 4251086 (S.D. Ohio July 13, 2015); *Brumbaugh v. Comm'r of Soc. Sec*., 989 F. Supp. 2d 690, 699 (S.D. Ohio Dec. 16, 2013) ("The ALJ's assessment of Plaintiff's capabilities cannot serve to replace the recommendations of the treating physician or even a medical expert; this determination must be left to the medical professionals, not to the ALJ.").

**B.      Caring for Yourself**

The domain of caring for yourself considers "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area."   20 C.F.R. § 416.926a(k); *see also* S.S.R. 09-7p.   For school-age children (age six to attainment age of twelve), the following is specifically considered:

> You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely.   You should begin to recognize that you are competent in doing some activities and that you have difficulty with others.   You should be able to identify those circumstances when you feel good about yourself and when you feel

bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv); *see also* S.S.R. 09-7p (stating that this domain considers, *inter alia*, a child's ability to "to recognize and respond appropriately to their feelings in ways that meet their emotional wants and needs" and that "[c]hildren should demonstrate an increased capacity to self-regulate [have the ability to experience, use, and express emotion] as they develop"). Some examples of limitations that may be considered include placing non-nutritive or inedible objects in mouth, failing to dress or bathe self appropriately for one's age because of an impairment that affects this domain, and engaging in self-injurious behavior. 20 C.F.R. § 416.926a(k)(3)(i), (iii), (iv).

In the present case, the ALJ determined that R.O. had a "less than marked" limitation in this domain, reasoning as follows:

At the psychological consultative examination the claimant's mother reported that she picks out clothes, and [R.O.] needs assistance getting himself ready for school in the morning. He also continues to put clothes and shoes on incorrectly. However, he can bathe himself, but, understandably considering his age, needs assistance with setting the water temperature and getting himself completely clean. He has a good appetite and eats a variety of foods and sleeps well. The claimant can be oppositional about doing chores or putting toys away, again, not unusual for his age. Also, the claimant engages in routine activities such as playing video games for extended periods of time, reading, drawing, running around, and watching cartoons on television (Exhibit 7F, p. 4). And the evidence does not indicate any problems with self-injurious conduct. Thus this domain is also considered "less than marked."

(R. at 35.)

Plaintiff argues that the ALJ's decision in this regard is not supported by substantial evidence. (ECF No. 11 at 12–13; ECF No. 22 at 3.) The Undersigned again agrees. While

the ALJ's decision focused on R.O.'s ability to regulate his physical needs, this domain also assesses "a child's ability to cope with stress and frustration, handle changes in his/her environment, express anger safely when upset, and return to a state of emotional equilibrium after experiencing strong emotions." *Barber on behalf of D.A. v. Comm'r of Soc. Sec.*, No. 1:16–CV–2436, 2017 WL 3447834, at *16 (N.D. Ohio July 28, 2017) (citing S.S.R. 09-07p), *adopted by* 2017 WL 3438551 (N.D. Ohio Aug. 10, 2017). As set forth above, the record is replete with instances of R.O.'s emotional outbursts, shut downs, and difficulty with self-regulation. (*See*, *e.g.*, R. at 293–94, 297, 301, 566.) The ALJ, however, failed to address this evidence while assessing R.O.'s function in this domain. (R. at 35.) Accordingly, "it is unclear whether the ALJ considered the evidence regarding her ability to maintain a healthy emotional state (*i.e.*, handle stress and frustration, cope with change, and maintain emotional equilibrium) as it relates to this particular domain." *Barber on behalf of D.A.*, 2017 WL 3447834, at *17. The ALJ's analysis of R.O.'s ability to care for his emotional needs is therefore not supported by substantial evidence. *Id.*; *Reyes v. Comm'r of Soc. Sec.*, No. 1:17-cv-943, 2018 WL 3145843, at *9 (N.D. Ohio June 11, 2018) (recommending that decision denying benefits be reversed and remanded where the administrative law judge's analysis of the plaintiff's ability to take care of his emotional needs was not meaningful and not supported by substantial evidence), *adopted by* 2018 WL 3135931 (N.D. Ohio June 27, 2018).

As discussed above, a child is considered to functionally meet the disability listings when he or she has a marked limitation in at least two out of six "domains" of functioning, or an extreme limitation in only one domain. 20 C.F.R. § 416.926a(a); *Jordan ex rel. C.R.J. v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 602, 610 (S.D. Ohio 2013). Accordingly, having found that the ALJ decision in two of these six domains was not supported by substantial evidence for

the reasons set forth above, and noting that the ALJ found that R.O. had a "marked" limitation in

the domain of interacting and relating with others (R. at 31–32), the Undersigned concludes

remand is necessary to permit the ALJ an opportunity to more fully consider the evidence and

explain his findings in the domains of attending and completing tasks and taking care of

yourself.[3]

## IX.     CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that

substantial evidence does not support the ALJ's decision denying benefits.   Accordingly, it is

**RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-

disability finding and **REMAND** this case to the Commissioner under Sentence Four of § 405(g)

for further consideration consistent with this Report and Recommendation.

## X.     PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

---

[3]Because this finding obviates the need for analysis of Plaintiff's remaining assignments of error,
the Undersigned need not, and does not resolve whether the alternative bases support reversal
and remand.   Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments
of error, if appropriate.   *Cox v. Comm'r of Soc. Sec.*, No. 2:13-cv-1203, 2015 WL 1000648, at
*3 n.1 (S.D. Ohio Mar. 5, 2015).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

July 26, 2018                                        */s/Elizabeth A. Preston Deavers*
                                                     Elizabeth A. Preston Deavers
                                                     Chief United States Magistrate Judge